216    COURT OF APPEALS OF WEST VIRGINIA.

Jan'y Term,        Tompkins & Maden vs. Woodyard.        1872

# Charleston.

## TOMPKINS & MADEN vs. LEVI J. WOODYAD.

### January Term, 1872.

1. The endorsement by a partner in the name of the firm, of paper not belonging to the firm, which is in effect lending or giving the credit of the firm, carries with it the presumption that the partner making it was not authorized so to do.

2. A third party taking from a partner the signature of his firm upon his own private, individual transaction, cannot hold the firm without proof of authority, adoption or ratification of the act. And the taker of a note under such circumstances must prove the assent of the other partners, for *prima facie* such a transaction is a fraud, both on the part of the debtor and creditor.

Action of assumpsit in the circuit court of Kanawha county, brought to May rules, 1867. Trial, and judgment for plaintiff at June term, 1869.

The facts and evidence in the case appear in Judge Moore's opinion.

*Lee* and *Hedrick & Fitzhugh* for the plaintiffs in error.

It is submitted that the court erred in its judgment upon the facts of the case, and that the same should have been for the defendant, Tompkins, and the following points are relied on:

1. Maden's assignment of the note of Creigh, in the name of Tompkins & Maden, under the circumstances attending it, was clearly insufficient to bind the firm, and no recovery could be had against Tompkins upon it. It was plainly in violation of Maden's duty as a partner, and a fraud upon the rights of the firm. That it was his individual transaction, and for his individual purposes, distinctly appears. It was the case so frequently occurring of the use by a partner of the name and credit of the firm, without authority, for his per--

sonal advantage; and where this is known to the party dealing with him, the law is perfectly well settled that the firm will not be bound. Difficulty may arise as to the proof of such knowledge on the part of the creditor, but where such knowledge is established by the proofs, or is fairly to be inferred from the circumstances of the transaction, the rule is inexorable and its application infallible. Connected with this rule is another abundantly supported by authority, and in itself reasonable, just and convenient, which will settle most of the cases, and is, we submit, decisive of this. It is that whenever a party receives from any partner in payment of a debt due from that partner only, whether the debt be created at the time or executed before, the indebtedness or obligation of the firm *in any form*, the presumption of the law is that the partner gives this and the creditor receives it in fraud of the partnership, and consequently can maintain no demand against the firm upon it. Parsons on Partnership, p. 116 (111). It is true that in certain cases in England it has been intimated that if the name of the firm be used by a partner for his private debt, the partners will be held unless they shew covin or fraud on the part of the holder; and the mere fact that it was the private debt of one partner will not amount to *prima facie* proof of this. *Ridley* vs. *Taylor*, 13 East., 175; *Ex-parte Agace*, 2 Cox, 312; *Ex-parte Bonbonus*, 8 Ves., 540. But this is not the doctrine of the American courts. In them, the presumption is held much more strongly, and the fact that the debt grew out of the individual transaction of the partner will be deemed sufficient *prima facie* to put the creditor to proof of actual authority of the partner or the assent of the firm to be bound. *Rogers* vs. *Batchelor*, 12 Peters, 221; *Chazournes* vs. *Edwards*, 3 Pick., 5; *Gansevoort* vs. *Williams*, 14 Wend., 133; *Lansing* vs. *Gaine*, 2 John., 306; *Davenport* vs. *Runlett*, 3 New Hamp., 386; *Laverty* vs. *Burr*, 1 Wend., 529; *Dob* vs. *Halsey*, 16 John., 34.

In *Dob* vs. *Halsey*, Spencer, J., speaking of the difference between the courts of England and this country, on this point, says: "We require the separate creditor who has obtained the partnership paper for the private debt of one of the partners, to show the assent of the whole firm to be bound." And in *Rogers* vs. *Batchelor*, Story, J., said: "The
28

218    COURT OF APPEALS OF WEST VIRGINIA.

Jan'y Term,    Tompkins & Maden vs. Woodyard.    1872

true principle to be extracted from the authorities is, that one partner cannot apply the partnership funds or securities to his own private debt without the consent of the other partners. * * * * That the right (of the separate creditor) depends on the fact whether the other partners had assented to such disposition or not." Parsons on Part., 117 (112), n. u.

This doctrine of the American courts, that a third party taking from a partner the signature of his firm upon his own private, individual transaction, cannot hold the firm without proof of authority, adoption or ratification, is recognized as the settled law of the subject by Professor Parsons in his excellent work on partnership, and the numerous authorities for it collected and collated. See Parsons on Part., 212 (202), and n. (d.) And he adds : " We should say that the weight of authority in the English courts is in favor of rules substantially similar. That is, they also hold that if a creditor of one partner take partnership paper in payment of his debt from that partner, and there are no other facts in the case, the partnership would not be held, and the act of the holder of that paper would be deemed fraudulent in law." Parsons, 213 (204), nn. (e.) (f.) And Nelson, J., in *Gansevoort* vs. *Williams*, 13 Wend., 133, comes to the conclusion that the practical operation and effect of the rule of the English courts, and that of the rule of the courts of this country, are the same.

It may therefore be considered as the settled rule of the courts, both in England and this country, that if the third party deal with the partner with knowledge that it is his private and individual transaction, he knows enough to put him on his guard, and that he is now bound to inquire whether the firm authorized the particular use of their name, and he can only hold them on the ground that they did so authorize it in fact; and he must shew this as the foundation of his claim. Parsons, 212 (202), and cases cited in n. (d.) So mere ignorance on the part of such third party of the breach of trust of the fraudulent partner will not enable him to hold the firm if such ignorance imply gross negligence on his part. *Warren* vs. *French*, 6 Allen, 317 ; *Lloyd* vs. *Freshfield*, 2 Carr. & P., 325; 12 Eng. C. L. Rep., 154; *New York Fire Insurance Company* vs. *Bennett*, 5 Conn., 574. If the creditor be guilty of gross negligence, or if the nature of the transaction

COURT OF APPEALS OF WEST VIRGINIA.    219

Jan'y Term,        Tompkins & Maden vs. Woodyard.        1872

be such as to carry evidence with it of the misapplication of the name of the firm, or be otherwise such as should have put the creditor upon further inquiry, he cannot hold the firm. Story on Partn., §§ 129, 130, 133.   Parsons on Part., pp. 107 (103), 218 (209), 222 (212), and n. (1), 225 (215).

In *Lloyd* vs. *Freshfield* (above cited), Bailey, J., says : "If a man lend money where no prudent man ought, he himself is answerable if there be anything wrong.   This was a negligent act at least in the plaintiff to lend the money, and therefore he cannot call on an innocent man to pay it."   And in *New York Fire Insurance Co.* vs. *Bennett*, Hosmer, C. J., speaking of the position taken that the payee in that case who dealt with the partner, not having knowledge that special authority had not been given him, and the argument urged, which was in effect that he might fold his arms and reap a benefit from his supineness, says, that "common sense and common integrity require that he should make inquiry in such cases, and actually know that authority was given.   He is bound, on legal and fair principles, to sustain the affirmative.   He knows that the partnership is for mercantile operations.   He knows that the partner signing or endorsing a note in the name of the firm, from the partnership contract, had no authority.   He knows that the act can alone be authorized by the delegation of express authority.   And he knows that on the most common and best established principles in promotion of justice and prevention of fraud, the person claiming the obligation of contract against a partnership is bound to prove it."

Again, it is well settled that the endorsement by a partner in the name of a firm, of paper not belonging to a firm, which is in effect lending or giving the credit of the firm, carries with it the presumption that the partner making it was not authorized.   The business of a mercantile firm is usually buying and selling, and to lend the credit of the firm by endorsing paper not belonging to it is no part of the general and regular business.   The presumption of the law, therefore, is against the authority of the partner who signs the firm name for such purpose.   *New York F. Ins. Co.* vs. *Bennett*, 5 Conn., 574; *Stall* vs. *Catskill Bank*, 18 Wend., 466, 477; *Bank of Tenn.* vs. *Saffarans*, 3 Humph., 597; *Gansevoort* vs. *Williams*, 14 Wend.,

138; *Bank of Vergennes* vs. *Cameron*, 7 Barb., 143, 150. See Parsons on Partn., p. 225, (215).

Such is the general doctrine on this subject. It is founded in the principles of reason and justice, and is well supported by authority. It would be strange if it were different, for the inevitable result would be to place honesty at the mercy of knavery; to destroy all just confidence between man and man, and to enable a dishonest and fraudulent partner, if so minded, to utterly ruin his confiding associates without possibility of remedy or escape.

In this case Claypool, the cashier, was in a legal sense *particeps* in the fraud practised by Maden on the firm of Tompkins & Maden. The note of Creigh was payable to Maden individually; was his individual property, and not that of the firm. Tompkins knew nothing of the making or endorsement of the note. It arose from no matter pertaining to the firm, or in which the firm was in any way concerned. The negotiation was a private transaction of Maden, in which Tompkins had no interest, and from which he derived no benefit; no part of the proceeds went to his use or that of the firm, but the same was appropriated by Maden to his private purposes. All this was known to Claypool, and when Tompkins first heard of the transaction he gave notice to the bank that he would not be bound by it.

It was, at least, gross negligence on the part of Claypool, the cashier acting for the bank, in discounting the note, not to inquire if Maden was authorized to endorse it with the name of the firm. Had he done so, he would have learned that he was not. He saw that the note was payable to Maden individually, and that Maden was seeking to have it discounted on his individual endorsement. He was thus fully placed on his guard and warned that the negotiation of the note by Maden was not a partnership transaction. He was not at liberty to shut his eyes and disregard the warning afforded by the character of the transaction. He declines to discount the note on Maden's individual endorsement, and Maden then endorses it with the name of the firm, and Claypool then discounts it, and the proceeds are paid over to Maden. Surely it would be grossly unjust to hold Tompkins liable on this endorsement, and we challenge the production

of any authority upon which he can be so held without proof of previous authority to Maden to make the assignment in the partnership name or subsequent ratification by Tompkins. None such is offered or pretended, but that neither existed is plainly inferrible from the evidence.

2. The plaintiff failed to use that due diligence to recover the amount of the note from Creigh, the maker, that was required to entitle him to maintain a suit against the assignor.

The bank at which the note was made payable, not being an incorporated institution under the laws of this State, the note was a common law instrument only, and not negotiable. The plaintiff, therefore, could not maintain an action against the endorsers without shewing that he had used what is known in the law as due diligence to recover the amount of the note from the maker. Now "due diligence" always involves the idea that the assignee has adopted a judicious course of proceeding; and in general, it is the duty of the assignee to prosecute suit as promptly as may be against the maker, obtain judgment and sue out a *fieri facias* against his property without delay. And where such suit is *immediately commenced* on the maturity of the note and *vigorously prosecuted*, judgment obtained and execution sued out and returned "*nulla bona*," *without any delay* attributable to the plaintiff, he may well maintain his action against his assignor, not upon any technical legal effect of the assignment, but upon the principle of natural justice and of the action of money had and received, the soul of which is that the defendant has received money to which *ex aequo et bono* the plaintiff is entitled and has not forfeited his right to demand the same of the defendant by any negligence or default on his part, to recover the amount of the party whose proper debt it was, and who ought to have borne the burden to the relief of all the others. *Machie's Ex'rs* vs. *Davis*, 2 Wash., 219; *Norton* vs. *Rose*, 2 Wash., 233; *Minnis* vs. *Pollard*, 1 Call., 226; *Goodall* vs. *Stewart*, 2 Hen. & Murf., 113, and note; *Lee* vs. *Love & Co.*, 1 Call., 497; *Saunders* vs. *Marshall*, 4 Hen. & Murf., 455; *Brown* vs. *Ross*, 6 Murf., 391; *Whitworth* vs. *Adams*, 5 Rand., 377; *Drane* vs. *Scholfield*, 6 Leigh., 386; *Thompson* vs. *Govan*, 9 Gratt., 695; 2 Tuck. Comm., 339, 340, 341.

The note in this case fell due on the 7th of February, 1866.

The suit against the maker was brought on the 5th of July, 1866, only two days less than five months after the maturity of the note. Judgment was not recovered until the October term, 1866, and on the 9th of October, 1866, an execution was issued, which went into the hands of the sheriff of Kanawha county, and was by him returned "No property;" and in February, 1867, another execution issued, which was directed to the sheriff of Greenbrier county, where it was proved Creigh resided, and was returned "No property." At the time the note fell due, four terms of the circuit court were held in each county during the year. Two of these terms for the county of Kanawha. to-wit, that commencing on the 2d of April and that on the 2d of June, 1866—were suffered to pass without a suit having been brought. If the plaintiff had sued promptly on the note after it became due, he might have recovered a judgment at the April term, 1866. But he suffers this term and the next both to pass by without taking any step, and only brings his suit in time to get a judgment at the third term after the note became due. It is clear, therefore, that, after this delay, it was his duty to exculpate himself by showing that due diligence would not have altered the case. *Goodall* vs. *Stewart,* 2 Hen. & Murf., 105, 114; 2 Tuck. Comm., 342. The *onus probandi* was on the plaintiff, but he offered no proof whatever to show that an earlier judgment would not have availed, or that by reason of the insolvency of Creigh, or for any other cause it was unnecessary to sue. In fact it may be deduced from the evidence that Creigh was not insolvent, because it seems that he actually paid the amount of the note to Maden. And after the plaintiff obtained his judgment at the third term, in October, 1866, he delayed sending an execution to the county in which Creigh lived till February, 1867. Surely after such delays wholly attributable to the plaintiff, unaccounted for and unexplained, and without any proof to show that due diligence was unnecessary, or would have been unavailing, it would be against the current of all the authorities to hold the assignors responsible.

3. After Tompkins had given notice to the bank that Maden's use of the firm name on assigning the note was unauthorized, and that he would not be held bound by it, the

bank was guilty of such gross *laches*, amounting to fraud upon the rights of Tompkins, as will deprive it of all remedy against him. The bank was indebted to Maden in a large amount, and had the means of indemnifying itself against loss from the negotiation of this note in its own hands. It had the right to set off its claim against Maden on his individual assignment against so much of its indebtedness to him. It had full notice that Tompkins controverted its claim against him on the assignment in the name of Tompkins & Maden, and yet with this right and this knowledge, the bank paid Maden some fifteen hundred dollars in cash, and also discounted Mrs. Caldwell's note for him, and paid him the nett proceeds, amounting to about one thousand dollars more. Now it was the plain duty of the bank to have provided for the Creigh note in these transactions. It had the right to insist that it should be permitted to retain a sufficient amount in its hands to meet the Creigh note in case the effort to recover it from Creigh should prove ineffectual. It is in vain to say that those moneys were paid, and the note of Mrs. Caldwell discounted on a compromise between the bank and Maden, to secure which the bank was coerced to pay the money and discount the note. The bank owed Maden, and could claim to set off its indebtedness against Maden's demand. Tompkins was an innocent party who had received no benefit from the assignment of the note made in the name of the firm by Maden, and this the bank well knew. It was clearly, therefore, its duty to protect itself and him by withholding an amount of its indebtedness to Maden equal to the amount of the Creigh note. If it chose voluntarily and with its eyes open, for reasons looking to its own advantage, to compromise the matter with Maden and pay over to him the funds in its hands, it did so at its peril, and cannot be permitted to turn around and hold an innocent party responsible for this claim, which it had perfectly in its power to secure out of funds in its hands, but which it chose to surrender without doing so, and that without the knowledge or consent of that party. Its claim against Tompkins is upon the equitable action of assumpsit for "money had and received," the principle of which is that the defendant has received money which *ex aequo et bono*, he ought to pay over to the

plaintiff. Certainly there can be no equity in the claim of the bank against Tompkins under the facts of the case. The course pursued by it plainly operated as a fraud upon the rights of Tompkins and a forfeiture of its claim, if any it had, to charge him upon the assignment made by Maden in the name of the firm.

*Smith & Knight* for defendants in error.

First. The plaintiff did use due diligence in the prosecution of the claim against the debtor. The question of diligence depends upon the circumstances of each case, and the courts have never attempted to settle, arbitrarily, a fixed time within which suit must be brought. It is not claimed by the defendants that the debtor was in any more solvent condition when the paper matured than he was when suit was brought, or at any time subsequent thereto. In this case suit was brought within five months after maturing of the note, the debtor living in a distant county. In the case of *Barksdale* vs. *Fenwick,* 4 Call., p. 492, the assignment was made and the right of action accrued to the assignee on the 13th of March, 1794. Suit was brought the 23d of December, 1794, and dismissed, by order of the assignee, at rules. Another suit was brought in February, 1795, and judgment in April, 1798, and a return of *nulla bona,* all the parties living in the same city. In a subsequent action by the assignee against the assignor, he recovered judgment, which was affirmed on appeal. The court in this case was divided, but it will be noticed that there was proof in the case that the debtor was doing business and paid large debts several months after the right of action accrued to the assignee; and the dissenting judges base their opinion as to the question of diligence upon this proof. Note also, in the opinion of Judge Lyons, the difference between the principles applicable to common law paper and commercial paper and upon the burden of proof. See, also, *Minnis* and *Pollard,* 1 Call, p. 226, whose right of action accrued to the assignee against the debtor, June 20th, 1791, and suit was not brought till April, 1792. It is submitted by the plaintiff that no decision can be found affirming that prosecution of the suit within five months after the maturity of the paper assigned, is not due diligence.

Second. The question of diligence has no application to this case. The proof is, that the debtor paid the debt to the assignors. It makes no difference, so far as the assignors are concerned, whether paid before or after assignment, or before or after suit and judgment on the note against the maker, they are estopped by the collection of the note from raising the question of diligence.

Third. The debtor lived in Greenbrier county (see page 13 of the record). The court will take judicial cognizance of the fact that, at the time of the maturity of the note, and for some months thereafter, there were no courts in Greenbrier county which could have entertained jurisdiction of a suit, or whose judgment would have been valid, and there were no officers to execute process. It is also a fact of historical notoriety, of which the court will take notice, that up to the close of the rebellion, which occurred long after the maturity of the note, Greenbrier county was within the Confederate lines, and no process could have been sent from the county of Kanawha; or, if sent, could not have been served in Greenbrier county until the close of the rebellion. '3 Hagans, *Mann* vs. *Lewis*, 223.

Fourth. The firm of Tompkins & Maden were bound by the assignment of the note. They were a commercial partnership, and it was perfectly in the scope of their partnership business to make and endorse bills, notes and drafts, &c. See Story on Partnership, §§ 102, 102a, 103, 104, 105, and particularly 108. As is shown by the authorities above cited, partners engaged in trade and commerce are held to a strict liability upon the contracts made by each member of the firm in the partnership name. There would be no safety in dealing with such a partnership if every partner had to be consulted before a transaction could be concluded binding upon the firm, and such a limitation upon the obligations of partners would almost put a stop to commerce and trade. There was nothing in the transaction in this case unusual, nor any evidence of negligence on the part of the plaintiff. Maden, one of the firm, presented a note made payable to himself, for discount. The bank declined to discount it without further security. He then endorsed it in the firm name, which he had the right and power to do; and for all the

29

plaintiff knew, it was to raise means for the use of the firm. Tompkins and Maden, by forming and continuing their partnership, proclaimed each other to the business world as persons worthy of trust and credit, and as authorized to act for each other, and it would not only have been impertinent for the plaintiff to have gone to Tompkins and enquired whether he sanctioned the transaction, but it would have been an unpardonable ·reflection upon the honesty of his partner, whom he had advertised as honest and trustworthy, by the connection he had formed and maintained with him.

Fifth. After being notified by Tompkins that the firm never received the proceeds of the note in suit, the bank never had the means or opportunity to recover of Maden. It is argued by counsel for appellants that because the bank paid Maden a considerable sum in compromise of a suit, that they must have been liable to, or indebted to Maden. This does not necessarily follow. It might have been, as it was in fact in this case, that it was a compromise of another large claim which the bank held against Maden and others, and which Maden was defending while the other· parties were making no defense thereto. The record conclusively shows that no funds of Maden passed through the hands of the officers of the bank over which they had any control, or out of which they could have satisfied the note. And even if they had possessed funds belonging to Maden individually, they could not have used them without Maden's consent, in payment of a firm liability, upon the mere assertion of Tompkins that the assignment was made without his knowledge or consent.

Finally, they could not use either the partnership or the individual funds of the assignor in payment of the note, until they prosecuted the maker to insolvency.

MOORE, J. Assumpsit in the circuit court of Kanawha county by *Plaintiff* vs. *Defendants*, on the following note:

$460                    CHARLESTON, W. V., October 7, 1865.

Four months after date, I promise to pay to .the order of William Maden, negotiable and payable at the Bank of the West, without off-set, four hundred and sixty dollars, value received.          CYRUS CREIGH.
Endorsed:
WILLIAM MADEN,
TOMPKINS & MADEN.

Defendants demurred to the declaration, and pleaded *non-assumpsit;* and Tompkins filed a special plea, in which he alleged that at the time of the alleged assignment to plaintiff, he and Maden were engaged as partners in merchandizing, under the firm name of Tompkins & Maden; that by their partnership agreement neither member of the firm could use the firm name in any transaction not within the partnership business; that the assignment of the note of Creigh did not pertain to, nor was it within said partnership business, nor was said note at any time the property of the partnership; that the making of the said note and the assignment thereof were transactions in which neither Tompkins nor said firm had any interest; that Tompkins did not assign the note nor use the name of the firm so to do, and that if Maden did use the name of the firm to make such assignment, he did so without authority to bind Tompkins in that behalf; and so said Tompkins was not a partner in making said assignment as alleged in the declaration; that said assignment, if any such was made, was made to the Bank of the West, composed of plaintiff and Claypool and others, of which Claypool was agent, in taking said assignment, and had notice of the foregoing premises.

At the June term, 1869, by consent, the case was tried by the court in lieu of a jury, and judgment rendered in favor of the plaintiff for five hundred and sixty-one dollars and nineteen cents, amount due, with interest from date of the judgment, and costs. Defendants moved the court for a new trial, but the motion was overruled, and to this action of the court Tompkins tendered his bill of exceptions, setting out the facts proved at the trial, as follows, viz:

"Be it remembered, that on the trial of the cause before the judge, the plaintiff read in evidence on his behalf the note in the declaration mentioned, in the words and figures following, to-wit: (See note heretofore copied and made part of this record.) The plaintiff then proved that the names William Maden and Tompkins & Maden, endorsed on said note, were in the proper handwriting of said William Maden. It was proved that the defendant, William H. Tompkins, and said William Maden were, at the time said note was made and endorsed, partners exercising the business of merchants in the town of Charleston, in Kanawha county.

"The defendant, William H. Tompkins, was then sworn as a witness on his own behalf, and proved that he knew nothing of the making of said note, or the endorsement of the name of Tompkins & Maden thereon at the time either of those acts were done, and that the first he knew thereof was about the time of the maturity of said note. It was proved by Tompkins that the consideration of said note was not a matter pertaining to the partnership of Tompkins & Maden, or in which they as partners were in any way concerned, but was a private transaction of said Maden, in which the said Tompkins had no interest as partner or otherwise, and from which he derived no benefit; that when he first heard of it (about the time of the maturity of said note, or a little before,) he gave notice to the Bank of the West, then the holder and owner of said note, through their cashier, John Claypool, that the said note and endorsements thereon were not partnership transactions of Tompkins & Maden, and that he was not responsible and would not pay it. It was also proved that the Bank of the West was not an incorporated institution, but was a private partnership, and that said John Claypool was their cashier, and that he and the plaintiff were both partners therein; that at the time, or about the time of the date of said note, the maker thereof and said Maden went to the Bank of the West and offered said note to Claypool, as cashier, for discount, endorsed by said Maden only, which said Claypool declined to do; that said Maden then endorsed the said note in the name of Tompkins & Maden, and offered it again for discount, and the note was then discounted and became the property of the said bank. And it was also proved that the Bank of the West had no notice at or before the discount, or until about the time it became due, that Tompkins did not recognize it as a legitimate transaction on the part of the firm of Tompkins & Maden. It was also proved that after said Tompkins had given notice to said Claypool as aforesaid, that said note was not a partnership transaction of Tompkins & Maden, said bank, in another transaction with said Maden alone, paid him through their agent, William A. Quarrier, about one thousand five hundred dollars, and that said bank also discounted for him a note of Mrs. Caldwell, and paid him through the same agent the nett proceeds, amounting to one thousand dollars.

" But it was proved that this money was paid, and not discounted, in the compromise of a suit between Maden and the bank, and in which compromise the actual payment of money and the discount of the note was a condition precedent, which left the bank no power to retain the money or to refuse the discount, and the bank, to secure the compromise, was coerced to pay the money and discount the note aforesaid. It was also proved by the plaintiff that he, in the name of William Maden, the payee, for the plaintiff's benefit, brought suit in the circuit court of Kanawha county, on the 5th day of July, 1866, and at the October term, 1866, obtained judgment against the maker of said note, and on the 9th day of October, 1866, caused an execution of $fi. fa.$ to issue thereon, which went into the hands of the sheriff of Kanawha county, and was returned 'No property found;' and that on the 14th day of February, 1867, he sued out another execution of $fi. fa.$, directed to the sheriff of Greenbrier county, which was returned by the sheriff thereof 'No property found.' It was also proved that Cyrus Creigh, the maker of said note, resided about three miles from Lewisburg, in the county of Greenbrier, and that he paid said note to said William Maden, but the time at which this payment was made was not proved. The foregoing were all the proofs in the cause."

From the said judgment of the circuit court the defendants appealed to this court.

It is well settled that the endorsement by a partner in the name of a firm, of paper not belonging to the firm, which is in effect lending or giving the credit of the firm, carries with it the presumption that the partner making it was not authorized. The business of a mercantile firm is usually buying and selling; and to lend the credit of the firm by endorsing paper not belonging to it is no part of the general and regular business, and the presumption of the law, therefore, is against the authority of the partner who signs the firm name for such purpose. It is the well settled doctrine of the American courts, that a third party taking from a partner the signature of his firm upon his own private, individual transaction, cannot hold the firm without proof of authority, adoption, or ratification. Such has been the argument of the appellants in this case, well supported by authority. Professor Parsons

recognizes the law to be settled, that "if one partner signs or endorses a note with the partnership name, but in payment or security of his private debt, and the taker knows it to be so, the other parties are not bound without their assent, or some act which justified the taker in supposing their assent; and the admissions of the partner signing are no evidence to prove the assent of the others. In this country it is clearly settled that the taker must prove the assent of the other partners, for *prima facie* such a transaction is a fraud both on the part of the debtor and the creditor." (1 Parsons on Bills and Notes, p, 125, &c., ch. 5, § 5, and notes citing many authorities.) In *Mercein* vs. *Andrews*, 10 Wend., 461, cited by Prof. Parsons, it was held "that a partner is not liable to the payment of a note endorsed by his co-partner in the name of the firm, out of the course of the partnership concerns, although he be present and hear the arrangement respecting the endorsement; his assent must be proved, and will not be presumed."

It seems to me the facts proven in the case now before us were sufficient, under the numerous authorities settling the principle in similar cases, to have warranted a judgment in favor of the defendant, Tompkins, and that the court below erred in giving judgment against him. The judgment being a joint one against the defendants, Tompkins and Maden, should be reversed as to both, with costs here and in the circuit court, and this court proceeding to give such judgment as the court below should have done, must give judgment against the defendant, William Maden, with costs in the court below.

The other judges concurred.

JUDGMENT REVERSED.